Huey Henry BREAUX, d/b/a H.H. Breaux, Enterprises, Plaintiff-Appellee,

v.

SCHLUMBERGER OFFSHORE SERVICES, A DIVISION OF SCHLUMBERGER LTD., Defendant-Appellant.

No. 86–4441.

United States Court of Appeals, Fifth Circuit.

June 2, 1987.

Ramon P. Marks, New York City, Michael P. Hantel, Sugar Land, Tex., for defendant-appellant.

John G. Swift, Davidson, Meaux, Sonnier & Roy, Lafayette, La., for plaintiff-appellee.

Before GARZA, WILLIAMS and GARWOOD, Circuit Judges.

GARZA, Circuit Judge.

This diversity case requires us to consider and apply the doctrine of detrimental reliance as it relates to Louisiana law. Our second review of this litigation focuses on the question whether a property owner was justified in removing his building from the commercial market in reliance on the representations of an employee that his employer would formalize lease terms agreed to by the owner and employer. We are asked also to consider whether the district court was clearly erroneous in awarding damages to the owner of the building on the basis of promissory estoppel.

## I.

In July of 1981, Eugene Pohoriles, the former vice-president and general manager of Schlumberger Offshore Services ("Schlumberger"), sent construction coordinator, T.C. Nicholls, to Lafayette, Louisiana to locate suitable office space for a new Schlumberger division. Because of a rise in trade in the oil market, office space in Lafayette was in great demand and lessors could rent space easily, while virtually setting their own terms. Nicholls reviewed various plans and discussed lease terms with owners of several buildings, including Huey Henry Breaux ("Breaux"). Nicholls preferred Breaux's property and negotiated with Breaux informally. Although Nicholls was a senior engineer with Schlumberger and had been with the company for 32 years, he informed Breaux that final approval would have to come from his superiors at Schlumberger.

Accordingly, Pohoriles visited Breaux's building and expressed approval of the location and the property. He told Nicholls to contact Breaux again. On July 16, 1981, Nicholls sent a letter to Breaux indicating that Pohoriles had "selected" Breaux's building for the Schlumberger office in Lafayette. The letter "confirmed" Schlumberger's "intention to enter a rental agreement" for the second and part of the first floor. Further, it requested Breaux to forward a written agreement "for consideration and signature."[1] Breaux responded by promising to cease all efforts to rent the subject space, and holding the space until the projected move-in date of January 1, 1982.

In the following weeks, Nicholls, with Breaux's knowledge, informed other Lafayette lessors that Schlumberger had decided on Breaux's property and would not pursue other options. Additionally, Nicholls contacted an architect to draw up floor plans, a signmaker to create a logo and sign, and a draper and interior decorator about furnishings. In an October 12 letter to Breaux, Nicholls expressed satisfaction with the choice of Breaux's property, and urged Breaux to mail the written lease agreement. In part, the letter stated, "The more I see of your building the more I feel we made an excellent choice. We are waiting on your lease contract which will allow us to move in after January 1."

On October 15, Breaux mailed Schlumberger a proposed lease agreement which had been drafted by Breaux and his agent, Robert Marceaux. The thirteen page document incorporated the terms previously negotiated: a term of five years, at $16.00 per square foot or an annual rent of $95,-336.16, a January 1 move-in date, and an area encompassing all of the second floor. Because Nicholls was occupied when the document arrived, it remained on his desk unread for several days instead of being processed in the usual manner. Two events then transpired which changed the parties' agreement. First, due to a crisis in the oil industry, Lafayette became a lessee's market and the demand for office space diminished. Second, Pohoriles was replaced as vice-president at Schlumberger.[2] Of course, the new vice-president disapproved of Breaux's property, preferring larger and more centrally-located offices.

On November 13, impatient with Schlumberger's delay in signing the agreement, Breaux wrote a letter to Nicholls threatening a suit to force Schlumberger to consummate the transaction. In response, Schlumberger offered a deposit to hold the premises open until February while the company looked elsewhere. In January of 1982, Breaux rejected the offer and

---

1. Typed on Schlumberger stationery, that letter stated in pertinent part:

   Gene Pohoriles, our Vice President and General Manager, has selected your new office building as the most suitable for our operation for the next several years. This will confirm our intention to enter a rental agreement with your company regarding the office building now under construction on Congress Street. We ask that you hold the entire upper floor, and the areas on both sides of the entrance way on the lower floor for us.

   \* \* \* \* \* \*

   Please select the best time for sending the actual rental agreement to us for consideration and signature.

2. Pohoriles died before the trial and before Breaux had an opportunity to depose him.

brought a diversity suit for specific performance. When Schlumberger later leased other premises, Breaux amended his complaint to include a plea for damages. Although Breaux immediately began searching for other tenants, he was unable to lease the building on terms as favorable as those in the Schlumberger deal.

Following a bench trial in December of 1984, the district court concluded that Schlumberger, through Nicholls, had orally leased Breaux's building. Although a written lease was contemplated, the oral agreement was binding because: 1) the principal terms of the lease were finalized; and 2) both parties had manifested their intent to be bound by acting upon the agreement to the fullest extent possible given that the building was not yet finished. Schlumberger's consent to the agreement was implied from Nicholls' letters and actions. While Nicholls had no actual authority to bind the company, he had apparent authority due to the content of the letters, the use of company stationery, his position in the company, and his dealings with outside companies such as the architect, signmaker, and other lessors in Lafayette. Judgment was rendered in favor of Breaux in the sum of $124,069.64, together with interest.

On January 16, 1986, a summary calendar ruling of this Circuit reversed the judgment of the district court. We ruled that, although an oral lease did in fact exist, Nicholls had no apparent authority to enter into a lease agreement with Breaux. *Breaux v. Schlumberger Offshore Serv.*, No. 85–4230, slip op. at 7 (5th Cir.1986) [781 F.2d 901 (table)]. On February 14, 1986, this Court, while reviewing Breaux's Petition for Panel Rehearing, remanded the case to the district court for consideration of Breaux's alternative theory of detrimental reliance. The detrimental reliance theory, although pleaded by Breaux, was not decided upon in the district court.

On remand, the court found that Breaux justifiably relied, to his detriment, on Nicholls' July 16 letter indicating that Schlumberger intended to enter a binding lease agreement. Finding that Breaux had proven the elements of a cause of action for detrimental reliance, the court once again awarded damages of $124,069.64. This figure was based on the difference between what Schlumberger would have paid under the lease and what Breaux was able to receive from other lessees.

## II.

Effective January 1, 1985, after the complaint in this litigation was filed, the Louisiana Civil Code was amended to provide a distinct remedy for a detrimental reliance cause of action for enforcing obligations. Article 1967 provides:

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

La.Civ.Code Ann. art. 1967 (West 1985). Although purporting to be new, this article did nothing more than codify existing practice. We agree with the district court that it is not necessary to determine whether Article 1967 is retroactive since Louisiana courts have recognized a cause of action for detrimental reliance under Article 2315. In relevant part, Article 2315 provides: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La.Civ. Code Ann. art. 2315 (West 1986). "For nearly a century, Louisiana courts, in a variety of factual situations, have enforced promises on the ground of detrimental reliance." Herman, *Detrimental Reliance in Louisiana Law—Past, Present, and Future (?): The Code Drafter's Perspective,* 58 Tul.L.Rev. 707, 715 (1984). Detrimental reliance, also referred to as promissory estoppel, is an accepted and vital part of the jurisprudence of Louisiana. *See John Bailey Contractor, Inc. v. State,* 439 So.2d 1055, 1059 (La.1983); *Simmons v. Sowela Technical Inst.,* 470 So.2d 913, 922 (La.App.3d Cir.1985).

The essential elements to state a detrimental reliance theory of recovery in Louisiana are: (1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. *John Bailey Contractor, Inc. v. State,* 425 So.2d 326, 328 (La.App.3d Cir.1982), *aff'd,* 439 So.2d 1055 (La.1983).

■ Our study of the law has not revealed a case that provides direct authority. The district court relied on two Louisiana appellate decisions in finding Schlumberger liable to Breaux. As an appellate court, we review a district court's conclusions of law *de novo*. We are bound by its findings of fact, however, unless clearly erroneous. *See Pullman-Standard v. Swint,* 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982). Schlumberger argues on appeal that the district court misapplied *Dousson v. South Central Bell,* 429 So.2d 466 (La.App. 4th Cir.), *writ denied,* 437 So.2d 1135 (La.1983), and *Stewart v. Schmauss,* 191 So.2d 882 (La.App. 1st Cir.1966). It is our position that neither of these cases compel the holding reached by the district court. *Stewart* should be considered briefly, however, because it involves Louisiana's application of the detrimental reliance concept to a real estate fact pattern.

In *Stewart,* the landlord, while speaking to his agent on the telephone, agreed to the terms of a lease with the tenant. 191 So.2d at 883. The landlord then dispatched a telegram confirming his acceptance of the lease. In reliance on the landlord's assertions, the tenant incurred various expenses while moving into the subject premises. The landlord, meanwhile, changed the subsequent written lease so that it was inconsistent with the oral agreement. When the landlord refused to fix the broken air conditioner, an obligation he had under the oral agreement, the tenant vacated the premises and sued for his reliance expenses.

The court held for the tenant, even though it found that no binding lease existed, because the landlord's assent to the lease and subsequent telegram led the tenant to believe that he had reached an agreement. *Id.* at 885. Thus, the landlord was liable to the tenant for damages under Article 2315. *Id.* Although *Stewart* does illustrate the enforcement of promises based on detrimental reliance, it does not inevitably lead to the conclusion that Schlumberger's promise to enter a binding lease in the future on terms orally assented to can justify detrimental reliance. Finding some guidance from *Stewart,* it is incumbent upon us to review and apply the facts to the requisite factors stated above to determine whether a cause of action exists.

■ The first factor that must be identified to establish detrimental reliance is a representation by conduct or word by Nicholls. Nicholls initially represented orally to Breaux that he preferred Breaux's building but that final approval would have to come from his superiors. At this point, moreover, Breaux and Nicholls had agreed on all the material lease terms. He next represented in writing that this approval was obtained when he sent Breaux the letter of July 16, stating that vice-president Pohorileṣ had "selected" Breaux's building and "confirmed" Schlumberger's intention to enter into a rental agreement with Breaux.

As the district court twice concluded and a prior panel of this Court agreed, Schlumberger did enter into an oral lease through the actions and letters of Nicholls.[3] This alone satisfies the first requirement of a representation by conduct. Schlumberger, through its agent, represented to Breaux that a contract was formed.

■ The second requisite to an action for detrimental reliance is that the reliance on the representation be justified. It should be noted first that Breaux was not dealing with a fly-by-night company. Schlumberger is a well-respected company and maintains a worldwide network. This fact gave

---

**3.** This Court previously wrote:
Schlumberger's attempt to parse Nicholls' letters so as not to manifest his 'consent' is unpersuasive; in context, the language plainly indicates his satisfaction with the agreement.

Breaux confidence in the transaction with Schlumberger.

Schlumberger argues that language exists in this Court's previous opinion which dictates a finding that Breaux's reliance was not justified. The prior panel stated:

> Furthermore, the evidence does not warrant a finding that Breaux could reasonably believe that Nicholls—despite his contrary insistence—had authority to make a binding oral lease. Breaux is an attorney, presumably familiar with the usual course of corporate decision-making. He should have realized that Schlumberger would not finalize a half-million dollar lease through the casual exchange of letters and phone calls between Breaux and Nicholls, a lower-management level employee without legal experience. Nicholls continued to insist on a written agreement because, as Breaux surely knew, this large corporation follows standard procedure and does not leave these details to local employees but has its counsel review the details before the execution of a formal document at a high level.

We do not regard that panel's prior language as dispositive of whether Breaux was justified in removing his property from the market for detrimental reliance purposes. When this case first was appealed to this Court, our review focused on the doctrine of apparent authority. Under Louisiana's doctrine of apparent authority, a principal is estopped from disavowing the unauthorized acts of its agent where the principal's own actions have led an innocent third party to reasonably rely on the agent's representations. We held that Schlumberger's actions did not lead Breaux to reasonably rely on Nicholls' representations.

■ Under the theory of detrimental reliance, however, we focus on Nicholls' actions as an employee of Schlumberger. Under this tort theory, Schlumberger need do nothing separate and apart from the actions of its employee. Nicholls need be only in the course and scope of his employment when the tort occurred. Schlumberger itself may not have authorized or in-

structed Nicholls to bind Breaux, nor need they make Breaux think he was so authorized, but they are responsible for his actions as their employee. This is the basis for the doctrine of respondeat superior, and therefore our review of Nicholls' conduct changes according to the nature of the claim.

■ Assuming it was not reasonable for Breaux to believe that Nicholls could bind Schlumberger to a binding lease, it was reasonable for Breaux to believe that they would eventually execute the written agreement and move into the building. The terms of the lease, the price, the duration, and the square footage had been agreed to by the parties. Nicholls then told Breaux that Schlumberger's vice-president had personally viewed and selected Breaux's property. Nicholls asked Breaux to hold the space open for them. These actions reasonably conveyed the impression that Schlumberger would move into the building. Additionally, it was reasonable for Breaux to believe that Schlumberger would move in since he had learned that Schlumberger had negotiated with signmakers, interior decorators, and architects. In a letter dated October 2, 1981, on Schlumberger stationery, Nicholls wrote to a signmaker: "We have leased the entire upper floor of the brick office building being erected at 3909 West Congress Street in Lafayette." This signmaker, along with various architects, subsequently contacted Breaux and worked closely with him in order to properly furnish the building for Schlumberger. Plainly, Breaux's reliance on Nicholls' representations was justified.

■ The last essential element to establish a detrimental reliance action is whether Breaux changed his position to his detriment because of his reliance on Nicholls. As stated in the district court's original findings of fact, Breaux ceased all efforts to rent the second floor of the building upon receipt of the July 16 letter. At that time, Lafayette was a lessor's market. By December of 1981, the oil industry slumped and Lafayette was transformed into a lessee's market. On December 1, Schlumber-

ger informed Breaux that it felt that it had not committed itself to a binding agreement. Immediately, Breaux attempted to mitigate his damages. One tenant agreed to rent 65% of the second floor space on March 2, 1982. The terms provided for that tenant to rent 4,707.93 square feet at $16.00 per square foot for three years beginning May 15, 1982. Other leases were later entered into for the remainder of the second floor. The district court determined that Breaux's damages and lost rentals for the successive years 1982–1986 were: $45,-118.24 in 1982; $15,620.01 in 1983; $6,868.23 in 1984; $23,722.60 projected in 1985; and $32,740.56 projected in 1986. Clearly, Breaux did change his position to his detriment based upon Nicholls' representations.

### III.

After finding that Breaux proved a cause of action for promissory estoppel, the district court awarded damages for lost rentals in the sum of $124,069.64. The court's opinion provided no authority or reason for selecting this figure again on remand, but apparently the basis for this determination rested on testimony in the record that in July of 1981 a lessor's market existed in Lafayette. The trial court must have assumed that Breaux could have leased the building to another party on the same terms as those in the Schlumberger deal because the measure of damages is the difference between the Schlumberger figure and what Breaux actually received from the subsequent lessees.

Schlumberger contends that Breaux is entitled to restitution of his out-of-pocket expenses only, which amount to zero, and not to lost profits because it would be based on speculation. It cites *Coleman v. Bossier City*, 305 So.2d 444 (La.1974), and *Haskins v. Clary*, 338 So.2d 166 (La.App. 2d Cir.1976), *modified*, 346 So.2d 193 (La. 1977), *inter alia*, for the proposition that when recovery is based on detrimental reliance, only out-of-pocket expenses are compensable. However, these cases deal with recovery based on unjust enrichment princi-

ples and Schlumberger's reliance on unjust enrichment cases is misplaced.

In an action claiming unjust enrichment, damages generally are recoverable only to the extent of the benefit conferred. The authorities cited by Schlumberger do not limit Breaux's recovery because a detrimental reliance theory of liability differs from an unjust enrichment theory of liability. *See Coleman*, 305 So.2d at 447. Moreover, *Coleman* does not support Schlumberger's narrow reading. In *Coleman*, the court permitted recovery on an unjust enrichment theory. In *dictum*, it suggested that a detrimental reliance theory might also be available, and that, in such a case, recovery would extend to out-of-pocket expenses at a minimum. The court did not foreclose any other method of computing damages. *Id.* In fact, in *Sanders v. United Distrib., Inc.*, 405 So.2d 536 (La.App. 4th Cir.1981), *writ denied*, 410 So.2d 1130 (1982), the court awarded not only damages for out-of-pocket expenses, but additional damages because the plaintiff detrimentally relied on mistaken representations.

Louisiana law forbids an award of damages based on speculation. *Dousson*, 429 So.2d at 469. However, compensation for lost profits need not be determined with mathematical precision. Reasonable certainty suffices to permit a court to determine the extent of damages. *See Ellwest Stereo Theatres, Inc. v. Davilla*, 436 So.2d 1285, 1288 (La.App. 4th Cir.), *writ denied*, 442 So.2d 454 (La.1983). This Court reviews a district court's assessment of damages under the "clearly erroneous" standard. *NCH Corp. v. Broyles*, 749 F.2d 247, 254 (5th Cir.1985). Our study of the record indicates that, in the late summer of 1981, the commercial market condition in Lafayette was booming. There is evidence that lessors in Lafayette could lease office space nearly as fast as their buildings were being built. The record also contains evidence that there possibly existed another ready, willing and able lessee who was prepared, in the fall of 1981, to occupy the same space that Schlumberger agreed to occupy. Moreover, at trial Schlumberger's

counsel conceded that Breaux could have leased the second floor to another company, at $16 per square foot, to begin on January 1, 1982.

■ The testimony, exhibits and figures tendered by Breaux regarding the extent of damages were received by the district court and were not disputed. We agree that Breaux was damaged to the extent of losing future rent which had been calculated with reasonable certainty. Moreover, Breaux diligently mitigated his damages upon being informed that Schlumberger was backing out of the deal. However, we can only agree with the calculation of damages for the years 1982, 1983, and 1984. The actual damages sustained in those years were: $45,118.24 in 1982, $15,620.01 in 1983, and $6,868.23 in 1984. The total damages for these three years is $67,606.48, and that award will not be disturbed. The court, based on Breaux's calculations, also awarded estimated damages of $23,722.60 for 1985, and $32,740.56 for 1986. The estimated damages for those two years, totalling $56,463.16, is vacated because the court lacked sufficient information to make that determination. We must remand this case to the district court once more, solely for the purpose of determining the amount, if any, of damages suffered by Breaux for the years 1985 and 1986.

■ In conclusion, we find that the district court was not clearly erroneous in its judgment holding Schlumberger vicariously liable for the tort of detrimental reliance.[4] Under the doctrine of respondeat superior, Schlumberger was responsible for the actions of its employee, Nicholls, as he acted within the course and scope of his employment. The judgment of the district court is AFFIRMED in that respect. Regarding the award of damages, the judgment of the district court is AFFIRMED in part and REVERSED in part as provided herein. The case is REMANDED to the district court for a determination of damages, if any, for the years 1985 and 1986.

GARWOOD, Circuit Judge, dissenting:

I respectfully dissent.

The majority holds that Nicholls can bind Schlumberger to Breaux under the doctrine of detrimental reliance for exactly the same recovery as would be available if Nicholls had had apparent authority to obligate Schlumberger to lease the property, despite the fact that Nicholls had no such authority.[1] For his recovery under "detri-

---

**4.** Judge Garwood's dissent apparently misconstrues the focus of our review. We do not hold that one can allege less proof for a detrimental reliance theory than an apparent authority theory and expect to recover damages. We do agree with the dissent's statement that both this panel and the prior panel reviewed the same evidence. The prior panel, however, focused on Schlumberger's actions and determined that the company did not clothe Nicholls with apparent authority. Moreover, that panel explicitly remanded the case for the district court to pass on the question of whether Breaux justifiably relied on Nicholls' actions to his detriment. Clearly, the focus of our review differs because the nature of the actions differ.

We also take exception to the dissent's statement that Nicholls' actions were unauthorized. Our study of the record indicated that Nicholls was vested with necessary authority to find a location for a new division and engage in a lease on behalf of the company. Nicholls had been with Schlumberger for over thirty years and worked as a senior engineer for the company. He made the initial solicitations. He sent the July 16 letter to Breaux confirming the arrangement on behalf of vice-president Poho-

riles, and asked Breaux to remove the property from a demanding market. In addition to a signmaker, interior decorator and architects, Nicholls contacted other local lessors and told them that he had leased office space in Breaux's building. While the building was being completed, several of these people visited the premises and worked with Breaux to conform the building to Schlumberger's specifications. Based on these facts and the current state of promissory estoppel in Louisiana, Schlumberger, as principal, must be held responsible for the actions of its agent who was acting within the course and scope of his employment. Breaux was justified in relying on the actions of Nicholls that Schlumberger was going to occupy his building, and the evidence shows that he reasonably relied on these representations to his detriment.

**1.** The majority quotes the final paragraph of our opinion on the prior appeal. Also relevant is the immediately preceding portion of that earlier opinion, *viz.*:

"Here, we find no evidence of action on the part of the principal, Schlumberger, that would lead Breaux to believe that Schlumber-

mental reliance," in other words, Breaux is not required to prove anything he is not required to prove to recover under "apparent authority"; the elements of the two causes of action are exactly the same, except only that Schlumberger must have clothed its employee Nicholls with indicia of authority for an "apparent authority" recovery, but not for a "detrimental reliance" recovery. Significantly, there is no difference in the measure of recovery: in each case it is promissory, being based on what Breaux would have received had Schlumberger executed and fulfilled the lease. Who then, when seeking recovery from a principal on a promise made in his name by his unauthorized employee, will ever seek to recover under "apparent authority," when "detrimental reliance" will always get as much money but with less proof. Why climb the higher hill or carry the superfluous baggage? In essence, in all employee cases, the Louisiana doctrine of apparent authority has been vastly changed so that it is now no longer necessary to prove that something the principal did made it reasonable to believe that the employee had authority; provided *only* that the pleader and the district judge use the magic words "detrimental reliance." This, I submit, is an elevation of form over substance—of labels over content—in which the Louisiana courts would not indulge.

I do not believe Louisiana would invoke the doctrine of detrimental reliance to make such a vast change in its law respecting when a principal can be bound to a promise made in his name by his unautho-

rized employee.[2] The common law analogues of detrimental reliance are apparently promissory estoppel, *see Restatement (Second) Contracts* § 90, tortious misrepresentation, *see Restatement (Second) Torts* §§ 525, 526, 530, 544, 552, 552C, restitution of benefits conferred on or property transferred to another, *see Restatement of Restitution* §§ 15, 56, and apparent authority. *Restatement (Second) Agency* § 27. Only the latter is applicable here, yet we have already held that its requirements have not been proved. Promissory estoppel speaks not to want of authority, but to want of consideration. Restitution is inapplicable, for here recovery is not sought of any benefit conferred on or thing transferred to the defendant. *See Restatement of Restitution* § 15, comment *f* (transfer to an unauthorized agent does not allow recovery from the principal if not ratified or received by the principal); § 56 (items transferred in anticipation of a contract with the transferee may be recovered from the transferee if the contract is not formed or carried out). That leaves tortious misrepresentation. Recovery for misrepresentation of future intention—as opposed to misrepresentation of existing facts (or opinion respecting existing facts) —is limited to *fraudulent* misrepresentation. *Restatement (Second) Torts* §§ 525, 526, 530, 544, 552, 552C. There is no evidence here that any existing *fact*—or opinion concerning an existing fact—was misrepresented. There is no finding of fraud or even of negligence.

Accordingly, I respectfully dissent.

ger had consented to a lease or authorized Nicholls to finalize an agreement on its behalf. Breaux's strongest evidence is the language in Nicholls' July 16 letter stating that Vice President Pohoriles had 'selected' Breaux's building. Yet even assuming that Pohoriles was completely satisfied with the building and fully intended to go forward with the transaction, the 'selection' of the building was only a preliminary step in the consummation of a lease agreement. The details of the agreement remained to be worked out. No subsequent actions of either Nicholls or Schlumberger indicated that an agreement had been finalized."

**2.** The majority candidly concedes that the cases it looks to for guidance, *Stewart v. Schmauss,*

191 So.2d 882 (La.App. 1st Cir.1966), and *Dousson v. South Central Bell,* 429 So.2d 466 (La.App. 4th Cir.), *writ denied,* 437 So.2d 1135 (La.1983) (writ applied for by plaintiff), do not compel the result reached here. Neither involved a question of want of authority, and each seems to have treated the situation as involving a misrepresentation of existing fact—in *Stewart* as to the terms agreed on, in *Dousson* as to the telephone company's existing procedures. *Stewart* can also be seen as using promissory estoppel to prevent a party from backing out of a contract *he* had actually made but which was unenforceable for lack of formality, much like *Restatement (Second) Contracts* § 90. *See Preload Technology v. A.B. & J. Construction Co., Inc.,* 696 F.2d 1080 (5th Cir.1983).